FILED

2013 Dec-17  PM 04:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| MICHAEL ALLEN FITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 5:11-CV-4001-VEH |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff, Michael Allen Fite, brings this action pursuant to the provisions of 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for disability insurance benefits and Supplemental Security Income.  Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 42 U.S.C. § 405(g).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner must be reversed and remanded for further proceedings.

## I.  STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards

were applied.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Id.* (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Id.*  Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence.  *Id.*

Unlike the deferential review standard applied to the Commissioner's factual findings, the Commissioner's conclusions of law are not presumed to be valid.  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Therefore, the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  This includes the Commissioner's application of the proper legal standards in evaluating Plaintiff's claim.  *Martin*, 894 F.2d at 1529.

## II.  STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations outline a five-step process that is used to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). The Commissioner must determine in sequence:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    whether the claimant has a severe impairment or combination of impairments;

(3)    whether the claimant's impairment meets or equals the severity of an impairment in the Listing of Impairments;[1]

(4)    whether the claimant can perform any of his or her past work; and

(5)    whether there are significant numbers of jobs in the national economy that the claimant can perform.

*Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178 (11th Cir. 2011). The evaluation process continues until the Commissioner can determine whether the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A claimant who is doing substantial gainful activity will be found not disabled at step one.  20 C.F.R. §§ 404.1520

---

[1]    The Listing of Impairments, ("Listings") found at 20 C.F.R. Part 404, Subpart P, Appendix 1, are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity.  20 C.F.R. § 404.1525.

(a)(i), 416.920(a)(4)(i). A claimant who does not have a severe impairment will be found

not disabled at step two.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A claimant

with an impairment that meets or equals one in the Listing of Impairments will be found

disabled at step three.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Prior to considering steps four and five, the Commissioner must assess the

claimant's residual functional capacity (RFC), which will be used to determine the

claimant's ability to work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A claimant who

can perform past relevant work will be found not disabled at step four.  20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five the burden shifts to the

Commissioner to show other work the claimant can do.  *Foot v. Chater*, 67 F.3d 1553,

1559 (11th Cir. 1995). To satisfy this burden, the Commissioner must produce evidence

of work in the national economy that the claimant can do based on the claimant's RFC,

age, education, and work experience.  20 C.F.R. §§ 404.1512(f), 416.912(f).  A claimant

who can do other work will be found not disabled at step five.  20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920 (a)(4)(v).  A claimant who cannot do other work will be

found disabled.  *Id.*

In the present case, the Administrative Law Judge (ALJ) determined Plaintiff was

not engaged in substantial gainful activity, and found he had the severe impairments of

pseudoseizures, migraines, and bipolar schizoaffective disorder.  R. 15.  The ALJ

concluded Plaintiff did not suffer from a listed impairment. R. 18.  The ALJ found

Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all

exertional levels.  R. 21.  Plaintiff was never to climb ropes, ladders ,or scaffolds, and he was to avoid all hazards.  R. 21.   In addition, he was limited to simple 1-2 step tasks with only occasional contact with the general public and co-workers, to avoid stress.  R. 21-22.  With this RFC, the ALJ found Plaintiff unable to perform his past relevant work. R. 32.

When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines ("the grids") to establish the presence of other jobs at step five.[2]  *Foote*, 67 F.3d at 1558-59.  The presence of a non-exertional impairment (such as pain, fatigue, or mental illness) also prevents exclusive reliance on the grids.  *Id.* at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony."  *Id.*  Based on Plaintiff's RFC and expert vocational testimony (VE), the ALJ found Plaintiff could perform other work in the national economy.  R. 33, 119-121.  Therefore, the ALJ found he was not disabled at step five of the sequential evaluation framework.  R. 33.

### III.  FACTUAL BACKGROUND

Plaintiff filed applications for a period of disability, disability insurance benefits, and Supplemental Security Income (SSI) on December 22, 2009, and alleges he became

---

[2]    The Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, are used to make determinations of disability based upon vocational factors and the claimant's residual functional capacity when the claimant is unable to perform his vocationally relevant past work.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).  Such determinations, however, are only conclusive when all of the criteria of a particular rule are met.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).

disabled on January 15, 2007.  R. 13.  Plaintiff was 32 years old at the time of the ALJ's decision.  R. 32.  He has a high school education, and past relevant work as an administrative clerk for a school, and as a unit clerk in a hospital.  R. 32.  He alleges he is disabled due to symptoms caused by his Schizoaffective Disorder, Bipolar Disorder, and migraine headaches.[3]  Pl.'s Br. 4.  Plaintiff testified that he had extreme difficulty dealing with stress.  R. 110.  He also testified that he had extreme mood swings,  paranoia, and difficulty maintaining concentration.  R. 111-12.  Plaintiff testified he has migraines once or twice a week that "last anywhere from one to two days."  R.109.  He testified these headaches caused him be bedridden and unable to care for himself.  R. 109.  Although Plaintiff has a history of pseudoseizures, he testified at the hearing that he had not experienced such an episode for six months.[4]  R. 107.

The medical records show Plaintiff was diagnosed with  a pseudoseizure disorder in February 2006.  R. 353.  On October 18, 2006, Plaintiff reported suffering migraine headaches a couple of times per month, and was diagnosed with episodic migraines.  R. 440.  On January 28, 2007, Plaintiff reported an increased frequency of his pseudoseizures and accompanying migraine headaches caused by increased stress.  R. 437.

---

[3]  Schizoaffective disorder "is a mental condition that causes both a loss of contact with reality (psychosis) and mood problems." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001927/

[4]  Pseudoseizure is "an attack resembling an epileptic seizure but having purely psychological causes."  *Dorland's Illustrated Medical Dictionary* 1380 (28th Edition).

Plaintiff began treatment at the Alabama Pain Center in October 2009 for headaches and neck pain.  R. 587.  Plaintiff continued to be treated there through the date of the ALJ's decision.  R. 584-88, 650-669, 692-722.  Those treatment records show Plaintiff was prescribed Methadone and other narcotic pain medications during his course of treatment.

Plaintiff also sought treatment at the emergency department of Huntsville Hospital for a headache on August 2, 2009.  R. 552-567.  Plaintiff was seen at the  Decatur General Hospital emergency department on numerous occasions from August 2009 to March 2011.  Plaintiff was seen for treatment of headaches on August 23, 2009; August 28, 2009; October 1, 2010; October 21, 2010; February 23, 2011; February 26, 2011; and March 16, 2011.  R. 569-73, 735-40, 758-63, 767-71, 800-04, 808-12, 817-22.  On June 29, 2010, Plaintiff was seen with cellulitis on his back.  R. 726-31.  On September 17, 2010, he was seen for abdominal pain.  R. 743-54.  On December 7, 2010, Plaintiff was seen for an abscess on his back.  R. 775-80.  He was seen complaining of dental pain on January 7, 2011, and January 8, 2011.  R. 784-88, 792-96.  On March 27, 2011, he was seen for a toothache.  R. 827-31.

Plaintiff received treatment for his mental impairments from Dr. Kumaramangalam, a psychiatrist.  R. 591-601, 645-48, 671-80.  On January 21, 2009, Dr. Kumaramangalam diagnosed Plaintiff with schizoaffective disorder.  He provided supportive therapy and prescribed medications during the course of his treatment.  On April 1, 2011, Dr. Kumaramangalam completed a medical source opinion form and

7

wrote a letter giving his opinions as to Plaintiff's ability to perform work related activities.  R. 681-82, 684.

Plaintiff also received therapy from Dr. Bloom, a psychologist, starting in February 2007.  R. 445.  Records show Plaintiff saw Dr. Bloom for therapy on a regular basis through April 2010.

In addition to the treatment records, Plaintiff was referred by the Social Security Administration to Dr. Barry Wood, Ph.D., for a consultative psychological evaluation. R. 603-06.  Dr. Wood diagnosed Plaintiff with Somatoform Disorder, not otherwise specified; Adjustment Disorder, not otherwise specified; and History of Alcohol Abuse.[5] R. 606.  Dr. Wood also included the provisional diagnosis of Personality Disorder, not otherwise specified.  R. 606.  He assigned a GAF score of 55.[6]  R. 606.  Dr. Wood's summary included the following:

---

[5]  "The common feature of the Somatoform Disorders is the presence of physical symptoms that suggest a general medical condition . . . and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder . . . ." *Diagnostic and Statistical Manual of Mental Disorders* 445 (4th Ed. 1994) ("DSM-IV").  "The essential feature of an Adjustment Disorder is the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors."  DSM-IV 623.

[6]  The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning.  *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Edition, Text Revision) ("DSM-IV-TR").  A rating of 51-60 reflects: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers.)"  DSM-IV-TR at 34 (emphasis in original).

His reports and those of his father suggest he developed a host of physical complaints after he was exposed to ostracism, conflict, and perceived harassment by his superior during military training.  Also noteworthy is the fact his somatic complaints began just prior to his expected deployment to combat.  The extent to which his faux-physical problems are driven by a deep-seated conversion reaction versus another motivational force or contingency is unclear.  In the examiner's experience, true conversion disorders are incredibly rare.  The extent to which many of the claimant's psychiatric symptoms erupt from the same source as his unfounded physical complaints is uncertain, but the question must be considered.  In any case, it's clear basic training changed his life.  He presented as quite comfortable during the interview, and he exhibited good social skills.

R. 605-07.

Dr. Wood opined Plaintiff's mental symptoms would affect, but not preclude, his ability to recall instructions; attend to tasks for at least two consecutive hours; and interact with coworkers, customers, and supervisors.  R. 606.  Dr. Wood also opined that "[i]n all candor, the examiner believes the claimant's ability to maintain employment is directly tied to his motivation to work in a particular job or the lack thereof."  R. 606.

## IV. ISSUES PRESENTED

Plaintiff raises two issues on appeal:  (1) whether the ALJ erred in according less weight to the opinions of his treating physicians, and (2) whether the ALJ properly evaluated the credibility of his testimony of disabling symptoms.

## V.  DISCUSSION

### A.

Plaintiff argues the ALJ failed to properly articulate good cause for according less weight to the opinion of his treating psychiatrist, Dr. Kumaramangalam.  Pl.'s Br. 4-8.

Under the Commissioner's regulations, a treating physician's opinion will be given controlling weight if it is well supported and not inconsistent with other substantial evidence in the record.

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).  In considering whether an ALJ has properly rejected a treating physician's opinion, this court is not without guidance.  "The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  "Good cause" exists when the evidence does not bolster the treating physician's opinion; a contrary finding is supported by the evidence; or the opinion is conclusory or inconsistent with the treating physician's own medical records.  *Id.*   If a treating physician's opinion is rejected, the ALJ must clearly articulate the reasons for doing so.  *Id.*  ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.")

Dr. Kumaramangalam has been Plaintiff's treating psychiatrist since February 2008.  R. 684.  On April 1, 2011, Dr. Kumaramangalam completed a mental medical source opinion form regarding Plaintiff's abilities to perform work-related activities on a day to day basis in a regular work setting.  R. 681-82.  Dr. Kumaramangalam indicated

10

several areas in which Plaintiff had marked limitations.  R.681-82.  Specifically, he indicated that Plaintiff had marked limitations in his ability to respond appropriately to supervisors and co-workers; use judgement in simple one or two step, work-related decisions; deal with changes in a routine work setting; understand, remember and carry out detailed or complex instructions; respond to customary work pressures; maintain attention, concentration or pace for two hours; and maintain social functioning.  R.681-82.  Dr. Kumaramangalam indicated Plaintiff had a extreme limitation in his ability to use judgement in detailed or complex work-related decisions.  R. 681.  He assessed mild limitations in Plaintiff's ability to respond appropriately to customers or other members of the general public; understand, remember and carry out simple, one or two-step instructions; and maintain activities of daily living.  R. 681-82.  Dr. Kumaramangalam wrote that Plaintiff's frequent mood swings, poor impulse control, poor stress tolerance, and sedating effects from medication were the clinical findings supporting these limitations.  R. 681-82.  In the section of the form asking for any other work related functions that were affected by Plaintiff's impairments, Dr. Kumaramangalam wrote Plaintiff "can't deal with any work related stress."  R. 682.

Dr. Kumaramangalam also wrote a letter on April 1, 2011, wherein he stated Plaintiff was diagnosed with "Schizoaffective Disorder and Bipolar Type."  R. 684.  He stated Plaintiff suffered from chronic severe headaches, frequent mood swings, emotional lability, ongoing paranoia, and poor frustration tolerance.  R. 684.  Dr.

11

Kumaramangalam concluded:  "I don't think he will ever be gainfully employed and I consider him permanently disabled."  R.684.

In discussing Dr. Kumaramangalam's opinions, the ALJ found that, although his "limitations were based on observation of the claimant over time, his notes do not support his assessment of limitations."  R. 29.  The ALJ did not discuss any specific examples from Dr. Kumaramangalam's treatment notes to show why they do not support his opinions.  In his discussion of the medical evidence, the ALJ's only reference to Dr. Kumaramangalam was the following:  "On December 11, 2009, at the Tennessee Valley Life Center, the claimant received his first diagnosis of schizoaffective disorder from Scariya Kumaramangalam, M.D."[7]  R. 17.

In *Winschel v. Comm'r of Soc. Sec.*, the court held the ALJ "must state with particularity the weight given to different medical opinions *and* the reasons therefor." 631 F.3d 1176, 1179 (11th Cir. 2011) (emphasis added).  The *Winschel* court observed that without such a statement "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence."  *Id.* (quoting *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).  In the present case, the ALJ did not explain why he found Dr. Kumaramangalam's treatment

---

[7]  This passing reference to Dr. Kumaramangalam's treatment of Plaintiff is in error, as he diagnosed schizoaffective disorder in his January 21, 2009, treatment note. R. 601.

notes did not support his opinions with sufficient particularity to allow the court to determine whether that finding was rational and supported by substantial evidence.

The Commissioner's brief contains several comments from Dr. Kumaramangalam's treatment notes that she asserts are inconsistent with his medical source opinion. Def.'s Br. 7. However, those examples were not cited by the ALJ and do not conclusively show Dr. Kumaramangalam's assessments are contradicted by his treatment notes. A reviewing court should not affirm the ALJ unless he has set forth the reasons for his decision with sufficient clarity to allow a proper review of his decision. In *Winschel* the court explained that "when the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,'" a reviewing court will "decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" 631 F.3d at 1179 (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). This is because the reviewing court's "function is to ensure that the decision was based on a reasonable and consistently applied standard, and was carefully considered in light of all the relevant facts." *Owens* 748 F.2d at 1516. In *Owens,* the court declined to uphold an ALJ's decision based upon reasons set forth by the Appeals Council. *Id.* at 1516, n. 6. The court observed that although the Appeals Council "supplied some possible grounds upon which the ALJ's opinion may have been valid, it could not resolve the critical problem of determining whether the ALJ in fact had based his decision on those grounds, rather than on improper ones." *Id.* Because the ALJ in the present case did not explain why he found Dr. Kumaramangalam's treatment notes were

13

inconsistent with his opinions, the court is unable to determine whether that decision was reasonable.

The ALJ also gave no weight to most of Dr. Kumaramangalam's medical source opinion form because of several mistakes about the format of the form.  The ALJ's discussion of that form shows that he mistakenly assumed the form was a mental residual functional capacity form utilized by State agency medical consultants.  The ALJ began his discussion by referring to the form as "[t]he mental residual functional capacity assessment form (SA-4734-F4-SUP)."  R. 28.  He stated that the first two pages contain "summary conclusions regarding the claimant's degree of limitation, however, the summary conclusions are not the statement of residual functional capacity."[8]  R. 28.  He found that the first section of the form represented "conclusions about the presence and degree of specific functional limitations" and was "merely a worksheet."  R. 28-29.  The ALJ stated that the first section's purpose is to ensure that "the medical consultant has considered each of the mental activities and the claimant's degree of limitation."  R. 29.  Therefore he concluded that pages one and two of Dr. Kumaramangalam's medical source opinion "are not residual functional capacity."  R. 29.  He also incorrectly stated

---

[8]  Dr. Kumaramangalam's form contains only two pages.  R. 681-82.  Form SA-4724-F4-SUP contains four pages.  R. 624-27.

that the terms none, mild, moderate, marked, and extreme were not defined.[9]  R. 29.  For

these reasons, the ALJ concluded no weight could be given to those two pages.  R.29.

The ALJ, stated that "Section III of the form is the actual mental residual

functional capacity."[10]  R28.  He observed that section III of Dr. Kumaramangalam's

medical source opinion stated "patient can't deal with any work related stress."  R. 29.

He stated that his RFC finding "has taken into account Dr. Kumaramangalam's statement

regarding stress" by instructing the vocational expert (VE) "that claimant would need

low stress work which . . . would be accommodated by occasional contact with the public

and coworkers."  R. 29.

The ALJ's consideration of Dr. Kumaramangalam's medical source statement was

improper because of his mistakes about the format and content of the form.  He also

failed to apply the proper legal standards in finding that "no weight can be accorded" to

the first two sections of Dr. Kumaramangalam's medical source opinion.  The form asks

Dr. Kumaramangalam to give his "opinion . . . of how this individual's mental/emotional

abilities to perform work-related activities . . . are affected by his or her mental

impairment(s)."  R. 681.  The form also asks Dr. Kumaramangalam to identify clinical

findings, including symptoms that support his assessment.  R. 681.  Dr.

---

[9]  The form defined those terms, and ALJ actually included those definitions in his earlier discussion of Dr. Kumaramangalam's responses.  R. 28, 681.

[10]  Section III of the form completed by Dr. Kumaramangalam asks him to "state any other work-related functions which are affected by the impairment(s)."  R. 682.

Kumaramangalam complied with those instructions.  His medical source opinion form contains a description of Plaintiff's symptoms.  It also reflects his judgments about Plaintiff's mental restrictions and what he can still do despite his impairments.  These are medical opinions, which must be considered  by the ALJ.  *See Winschel* 631 F.3d at 1179 (finding treatment notes that contained "a description of Winschel's symptoms, a diagnosis, and a judgment about the severity of his impairments" were medical opinions) (citing 20 C.F.R. §§ 1527(a)(2), 416.927(a)(2)).  The regulation cited by *Winschel* provides that a physician's judgments about a claimant's symptoms, mental restrictions, and what he can still do in spite of his impairment are medical opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a).  Therefore, the ALJ's finding that no weight could be afforded to the first two sections of Dr. Kumaramangalam's medical source opinion was based on an improper application of the law.

The decision of the Commissioner must be reversed because the ALJ did not properly consider the medical opinions of Dr. Kumaramangalam.  The ALJ's finding that Dr. Kumaramangalam's opinions are inconsistent with his notes is not articulated with sufficient specificity to allow this court to determine whether it is reasonable.  His decision to give no weight to most of Dr. Kumaramangalam's medical source opinion was based on an incorrect legal standard, and a mistake about the format and content of the form.  On remand, the Commissioner shall consider Dr. Kumaramangalam's opinions in accordance with proper legal standards and state with particularity both the weight given to his medical opinions *and* the reasons for that decision.

16

**B.**

Plaintiff also argues the ALJ erred in failing to properly credit the opinions of Dr. Bloom, his treating psychologist.  Pl.'s Br. 8-9.  Dr. Bloom's treatment note of January 21, 2010, states Plaintiff "has reported severe and chronic headaches, while they may be psychogenic . . . , he does not appear to be malingering, [the] end result is inability to function, gain employment or follow through on simple tasks."  R. 633.  The ALJ gave little weight to Dr. Bloom's opinion.  R. 29.  He found Dr. Bloom's "own records are inconsistent with his opinion."  R. 29.  In contrast to his failure to discuss specific treatment notes or Dr. Kumaramangalam, the ALJ gave examples from Dr. Bloom's treatment notes to explain his decision.  The ALJ discussed treatment notes from Dr. Bloom showing Plaintiff "had not had any fugue symptoms and had not had any seizures over the past year," and that his "fugue states had dissipated when the claimant was compliant with his treatment."  R. 29.  The ALJ observed that Dr. Bloom repeatedly noted "feels good, relatively stable, doing well which is not consistent with his opinion." R. 29.

The ALJ also found Plaintiff's activities of daily living were inconsistent with Dr. Bloom's opinions.  R. 29.  The ALJ noted that records indicated Plaintiff "washes dishes, sweeps, mops, prepare[s] simple meals, plays the guitar, goes rifle shooting, works on [a] screenplay, emails, does research for his novel, works in the garage, shops and read[s]." R. 29.  He also found Plaintiff's testimony about his activities of daily living, "likewise

17

indicate extensive activities, like going out to eat, hobbies of shooting and collecting things, which are inconsistent with the opinion." R. 29.

On the present record, these reasons articulated by the ALJ provide good cause for rejecting Dr. Bloom's opinion that Plaintiff is unable to function, gain employment, or follow through on simple tasks. The ALJ's finding that Dr. Bloom's opinion was contrary to his treatment notes and other evidence of record, including Plaintiff's reported activities of daily living, is reasonable and supported by substantial evidence. *See Lewis v. Callahan*, 125 F.3d at 1440 (stating good exists when a contrary finding is supported by the evidence or the opinion is inconsistent with the treating source's own medical records). However, the reconsideration of Dr. Kumaramangalam's medical source opinion on remand may warrant a reconsideration of Dr. Bloom's opinions as well. That determination will be left to the Commissioner's sound discretion.

## C.

Plaintiff also argues the ALJ failed to properly evaluate his testimony of disabling symptoms. Pl.'s Br. 9-12. In this circuit a "pain standard" is applied "when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). The standard requires a claimant to show "evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Landry v.*

*Heckler*, 782 F. 2d 1551, 1553 (11th Cir. 1986).  "[W]hether objective medical

impairments could reasonably be expected to produce the pain complained of is a

question of fact . . . subject to review in the courts to see if it is supported by substantial

evidence."  *Id.*

 "[A] claimant's subjective testimony supported by medical evidence that satisfies

the standard is itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921

F.2d 1221, 1223 (11th Cir. 1991).  "If the ALJ decides not to credit such testimony, he

must articulate explicit and adequate reasons for doing so."  *Id.*  However, the ALJ's

credibility determination need not cite "particular phrases or formulations" as long as it

enables the court to conclude that the ALJ considered the claimant's medical condition as

a whole.  *Foote*, 67 F.3d at 1562.  "A clearly articulated credibility finding with

substantial supporting evidence in the record will not be disturbed by a reviewing court."

*Id.*

 The ALJ found Plaintiff had medically determinable impairments that could

reasonably be expected to cause his alleged symptoms.  R. 23.  Therefore, Plaintiff met

the pain standard applied in this circuit, and the ALJ was required to consider whether

Plaintiff's allegations of disabling pain were credible.  The ALJ's decision contains an

extensive discussion of his reasons for finding Plaintiff's allegations not fully credible.

The ALJ found Plaintiff's application for unemployment benefits "entails an assertion of

the ability to work and is facially inconsistent with the claim of disability."  R. 23.  He

also found Plaintiff's continued work after his first diagnosis of pseudoseizure disorder

"reflects the claimant was able to, and actually did work while suffering for ailments now claimed as disabling." R. 23. The ALJ also noted Plaintiff continued to drive after his diagnosis of pseudoseizures in 2006. R. 23.

The ALJ found Plaintiff's medications were relatively effective in controlling his symptoms, and cited to treatment notes supporting that finding. R. 23. The ALJ observed Plaintiff reported Methadone was working in controlling his migraines on February 4, 2010, and on March 1, 2010, he reported a significant decrease in pain for three months after a facet injection. R. 23.

The ALJ also found that inconsistencies in Plaintiff's testimony detracted from his credibility. R. 24. The ALJ cited examples showing Plaintiff had given inconsistent reports about his use of alcohol. R. 24. The ALJ concluded that "[w]hile the inconsistencies may not be the result of a conscious effort to mislead, nevertheless they suggest that the information provided may not be entirely reliable." R. 24.

The ALJ noted the consultative psychological examiner, Dr. Wood, found it "noteworthy" that Plaintiff's "somatic complaints began just prior to his expected deployment to combat," and "questioned the claimant's motivation to work." R. 24. The ALJ also observed that Plaintiff "told his therapist he was going to work as a lifeguard" during the summer of 2011. R. 24.

The court finds that on the present record, substantial evidence supports the ALJ's decision regarding Plaintiff's credibility. The evidence recited by the ALJ is sufficient to allow a reasonable person to conclude Plaintiff's allegations were not fully

20

credible, and this court may not substitute its judgment for that of the ALJ.  However, the reconsideration of Dr. Kumaramangalam's medical source opinion on remand may warrant a reconsideration of Plaintiff's credibility.  That determination will be left to the Commissioner's sound discretion.

## VI.  CONCLUSION

The court concludes the ALJ did not properly consider the opinion of Dr. Kumaramangalam, Plaintiff's treating psychiatrist. Therefore, the case will be reversed and remanded to the Commissioner for further proceedings. An appropriate order will be entered.

**DONE** and **ORDERED** this the 17th day of December, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

21